Filed 6/25/15 (second of two modifications; first modification and unmodified opn. follow)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BENEDICT COSENTINO,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>STELLA FULLER et al.,<br><br>    Defendants and Respondents. | G050923<br><br>(Super. Ct. No. MCC1300396)<br><br>ORDER FURTHER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

On the court's own motion, it is ordered the opinion filed in the above-entitled matter on May 28, 2015, as modified by the order filed on June 22, 2015, is hereby FURTHER MODIFIED as follows:

1.      On page 7 of the opinion, the earlier modification order deleted all of the original text of footnote number 1 and replaced it with new text, that new text is now modified to read as follows rather than as it read in the earlier modification order:

Cosentino contends he did not name the Gaming Commission or the Pechanga Band as defendants in this action because he anticipated they would assert tribal sovereign immunity. Instead, he sought to arbitrate his claims against the Gaming Commission and the Pechanga Band under the Tribal-State Compact. When they refused, Cosentino filed a petition in federal court to compel them to arbitrate his claims. The U.S. District Court denied the petition, and Cosentino's appeal from that decision is pending in the Ninth Circuit Court of Appeals.

2. On page 10 of the opinion, the earlier modification order deleted the last sentence of the first full paragraph on that page and replaced that sentence with a new sentence and citations to two cases, that sentence and the citations are now modified to read as follows rather than as they read in the earlier modification order and the original sentence that was deleted by the earlier modification order shall remain deleted:

Public Law 280 therefore grants California courts jurisdiction over civil disputes involving individual tribal members, but it does not grant jurisdiction over an Indian tribe. As another court has explained, Public Law 280 "'seems to have been primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens . . . .' [Citation.] Its effect is therefore 'to grant jurisdiction over private civil litigation involving reservation Indians in state court.' . . . [¶] It is very clear that Public Law 280 does not provide jurisdiction over disputes involving a *tribe*." (*Lamere v. Superior Court* (2005) 131 Cal.App.4th 1059, 1064; see *Long v. Chemehuevi Indian Reservation* (1981) 115 Cal.App.3d 853, 857.)

3. On page 11 of the opinion, the earlier modification order add two additional, new paragraphs after the second paragraph on that page, those two new paragraphs are now modified to read as follows rather than as they read in the earlier modification order:

To avoid individual liability for their actions, Defendants repeatedly claim Cosentino sued them in their official rather than individual capacities. Defendants therefore reason we must treat Cosentino's complaint as an action against the Gaming Commission or the Pechanga Band because Cosentino based his claims on official actions Defendants took as members of the Gaming Commission. Defendants, however, may not recast Cosentino's complaint to allege claims he did not assert. The claims belong to Cosentino and it is for him to decide what claims to allege, against whom to allege them, and in what capacity to name Defendants. Defendants may argue Cosentino's allegations do not state a claim against them in their individual capacity or that the allegations establish a defense to the claims, but Defendants may not change Cosentino's allegations.

Cosentino clearly alleges all claims against Defendants in their individual capacities on the theory Defendants abused and exceeded their official authority as members of the Gaming Commission, and therefore they are individually liable and not entitled to the protection of sovereign immunity. Cosentino did not name the Gaming Commission or the Pechanga Band as a defendant, and he did not request reinstatement or any other relief against those entities. Instead, Cosentino sought monetary damages against Defendants only in their individual capacities. As explained above, when an official acts in a manner that exceeds or conflicts with his or her valid authority, the official's actions are considered those of the individual rather than the sovereign. (See, e.g., *Turner*, *supra*, 82 Cal.App.4th at p. 1055.) Accordingly, we focus on the standards for determining whether a tribal official acted in his or her official capacity and within the scope of his or her official authority to determine whether Defendants are entitled to sovereign immunity protection.

3

4. On page 16 of the opinion, the earlier modification order added a new footnote number 4, the text of that new footnote is now modified to read as follows rather than as it read in the earlier modification order:

[4] In their rehearing petition, Defendants for the first time contend the Gaming Commission had authority to revoke Cosentino's license without cause as part of the Tribe's inherent sovereign authority over tribal gaming licenses. We decline to consider an issue Defendants raise for the first time in a rehearing petition. (*J.J. v. County of San Diego* (2014) 223 Cal.App.4th 1214, 1230, fn. 5; see *People v. Holford* (2012) 203 Cal.App.4th 155, 159, fn. 2 ["it is 'too late to urge a point for the first time in a petition for rehearing, after the case ha[s] been fully considered and decided by the court upon the points presented in the original briefs'"].) Cosentino's opening brief repeatedly argued the Gaming Commission's authority to revoke his license was limited to the specific grounds identified in the IGRA, the Tribal-State Compact, and the Pechanga Ordinance. Defendants provide no explanation why they did not raise this issue in their respondent's brief.

5. On page 19 of the opinion, the earlier modification order added a new footnote number 5, the text of that new footnote is now modified to read as follows rather than as it read in the earlier modification order:

[5] In their rehearing petition, Defendants contend sovereign immunity for tribal officials is absolute, and therefore applies even when tribal officials act maliciously with the intent to harm someone. This contention, however, ignores *Turner*'s statement that "[a] tribal official also may forfeit immunity where he or she acts out of personal interest rather than for the benefit of the tribe." (*Turner*, *supra*, 82 Cal.App.4th at p. 1055.) If an immunity may be forfeited based upon the holder's motive or purpose, the immunity is not absolute. Defendants' contrary assertion is unsupported by any authority.

These further modifications do not change the judgment.

Unless further modified by this order, the modifications made by the earlier modification order shall be made as described in that order. Similarly, the rehearing

petition and request for depublication remain denied for the reasons set forth in that earlier order.

                                    ARONSON, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.


5

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BENEDICT COSENTINO, | |
|     Plaintiff and Appellant, | G050923 |
|       v. | (Super. Ct. No. MCC1300396) |
| STELLA FULLER et al., | ORDER (1) MODIFYING OPINION; (2) DENYING REHEARING; AND |
|     Defendants and Respondents. | (3) DENYING DEPUBLICATION; NO CHANGE IN JUDGMENT |

On the court's own motion, it is ordered the opinion filed in the above-entitled matter on May 28, 2015, is hereby MODIFIED as follows:

1.    On page 3, the final sentence of the partial paragraph at the top of the page, starting with "Sovereign immunity prevents us from inquiring," replace the word "using" with the word "abusing" and insert "for their own personal benefit" at the end of the sentence, so the sentence reads as follows:

Sovereign immunity prevents us from inquiring into the reliability of

information Defendants may have relied upon in revoking Cosentino's

license or any other errors they may have made, but it does not prevent

inquiry into whether Defendants exceeded their authority by abusing their

official positions to intentionally harm Cosentino for their own personal benefit.

2.    On page 6, the first sentence of the fourth paragraph, starting with "In March 2013, Cosentino filed this action," insert the words "in their individual capacities" between the words "Defendants" and "alleging," so the sentence reads as follows:

> In March 2013, Cosentino filed this action against Defendants in their individual capacities, alleging claims for (1) intentional interference with prospective economic advantage; (2) negligent interference with prospective economic advantage; (3) intentional interference with the right to pursue a lawful occupation; (4) violation of Civil Code section 52.1; (5) intentional infliction of emotional distress; and (6) negligent infliction of emotional distress.

3.    On page 7, delete the text of footnote number 1 and replace it with the following:

> Cosentino contends he did not name the Gaming Commission or the Pechanga Band as defendants in this action because he anticipated they would assert tribal sovereign immunity. Instead, he sought to arbitrate his claims against the Gaming Commission and the Pechanga Band under the Tribal-State Compact. When they refused, Cosentino filed a petition in federal court to compel them to arbitrate his claims. The U.S. District Court denied the petition, and Cosentino's appeal from that decision is pending in the Ninth Circuit Court of Appeals. ~(**Open Brief p.11**)~

4.    On page 10, the last sentence of the first full paragraph, starting with "Sovereign immunity, however, may limit," delete that entire sentence and replace it with the following:

> Public Law 280 therefore grants California courts jurisdiction over civil disputes involving individual tribal members, but it does not grant jurisdiction over an Indian tribe. (*Lamere v. Superior Court* (2005)

2

131 Cal.App.4th 1059, 1064 [Public Law 280 "'seems to have been primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens. . . .' [Citation.] Its effect is therefore 'to grant jurisdiction over private civil litigation involving reservation Indians in state court.' . . . [¶] It is very clear that Public Law 280 does not provide jurisdiction over disputes involving a *tribe*"]; *Long v. Chemehuevi Indian Reservation* (1981) 115 Cal.App.3d 853, 857.)

5. On page 10, the second paragraph, starting with "'Under federal law, an Indian tribe,'" add the following sentence as the first sentence in the paragraph:

Sovereign immunity, however, may limit the reach of state law, including state tort law.

6. On page 11, after the second paragraph, starting with "An official's commission of a tort," insert the following paragraphs:

To avoid individual liability for their actions, Defendants repeatedly characterize Cosentino as suing them in their official rather than individual capacities. According to Defendants, we must treat this action as an action against the Gaming Commission or the Pechanga Band because Cosentino based his claims on official actions Defendants took as members of the Gaming Commission. Defendants, however, may not recast Cosentino's claims. The claims belong to Cosentino and it is for him to decide what claims to allege, against whom to allege them, and in what capacity to name Defendants. Defendants may argue Cosentino's allegations do not state a claim against them in their individual capacity or that the allegations establish a defense to the claims, but Defendants may not change Cosentino's allegations.

3

Cosentino unmistakably alleges all claims against Defendants in their individual capacities on the theory Defendants abused and exceeded their official authority as members of the Gaming Commission, and therefore are individually liable and not entitled to the protection of sovereign immunity. Cosentino did not name the Gaming Commission or the Pechanga Band as a defendant, and he did not request reinstatement or any other relief against those entities. Instead, Cosentino solely sought monetary damages against Defendants in their individual capacities. As explained above, when an official acts in a manner that exceeds or conflicts with his or her valid authority, the official's actions are considered individual rather than sovereign actions. (See, e.g., *Turner*, *supra*, 82 Cal.App.4th at p. 1055.) Accordingly, we focus on the standards for determining whether a tribal official acted in his or her official capacity and within the scope of his or her official authority to determine whether Defendants are entitled to sovereign immunity protection. Defendants' reliance on cases and other authority addressing how and when sovereign immunity applies to an Indian tribe is misplaced and we disregard those authorities.

7. On page 16, after the first full sentences at the top of the page, starting with "Defendants also failed to present any authority," add the following new footnote number 4:

[4] In their rehearing petition, Defendants for the first time contend the Gaming Commission had authority to revoke Cosentino's license without cause as part of the Tribe's inherent sovereign authority over tribal gaming licenses. We refuse to consider an issue Defendants raise for the first time in a rehearing petition absent extraordinary circumstances justifying the failure to raise the issue earlier. (*J.J. v. County of San Diego* (2014) 223 Cal.App.4th 1214, 1230, fn. 5; see *People v. Holford* (2012) 203 Cal.App.4th 155, 159, fn. 2 ["it is 'too late to urge a

4

point for the first time in a petition for rehearing, after the case ha[s] been fully considered and decided by the court upon the points presented in the original briefs'"].)  Cosentino's opening brief repeatedly argued the Gaming Commission's authority to revoke his license was limited to the specific grounds identified in the IGRA, the Tribal-State Compact, and the Pechanga Ordinance.  Defendants provide no explanation why they did not raise this issue in their respondent's brief.

8.  On page 16, the last sentence of the partial paragraph at the top of the page, beginning with "Accordingly, as in *Turner*," add the words "at this stage of the proceedings" to the end of the sentence, so the sentence reads as follows:

Accordingly, as in *Turner*, Cosentino's allegations and evidence that Defendants exceeded their authority by revoking his license without cause defeat Defendants' claim of sovereign immunity at this stage of the proceedings.

9.  On page 19, after the last sentence of the first full paragraph, starting with "To the contrary, the law withholds sovereign immunity," add the following new footnote number 5:

[5]  In their rehearing petition, Defendants contend sovereign immunity for tribal officials is absolute, and therefore applies even when tribal officials act maliciously with the intent to harm someone. ~(**Rehearing Petition pp. 19-26**)~  This contention, however, ignores *Turner*'s statement that "[a] tribal official also may forfeit immunity where he or she acts out of personal interest rather than for the benefit of the tribe." (*Turner*, *supra*, 82 Cal.App.4th at p. 1055.)  If an immunity may be forfeited based upon the holder's motive or purpose, the immunity is not absolute.

Defendants similarly argue their motivations in revoking Cosentino's license are irrelevant.  According to Defendants, the *Great Western Casinos* court applied sovereign immunity to dismiss intentional tort claims against tribal officials even though "'[t]he tribal council members' alleged motivations for these actions were plainly illegal and not expressly authorized under applicable law.'"  ~(**Rehearing Petition pp. 21 & 22**)~  The *Great Western Casinos* decision, however, does not include this quote Defendants attribute to it and we have been unable to find that quote in any other reported case.  Moreover, this rule also would conflict

5

with *Turner*'s statement that a tribal official may forfeit immunity by acting out of personal interests.

10. On page 19, the first sentence of the second full paragraph, starting with "Although Defendants cite several cases to support their contention," delete the phrase "Defendants fail" between the works "immunity" and "to discuss," and replace them with the words "Defendants' brief fails" so the sentence reads as follows:

Although Defendants cite several cases to support their contention the trial court properly dismissed Cosentino's claims based on sovereign immunity, Defendants' brief fails to discuss or even cite *Turner*, the only analogous factual situation involving a claim of sovereign immunity by tribal officials who allegedly exceeded the scope of their authority by engaging in intentional misconduct designed to harm the plaintiff.

11. On page 19, the second sentence of the second full paragraph, starting with "The cases Defendants cite are readily distinguishable," delete the sentence and replace it with the following sentence:

The cases Defendants cite predate *Turner* and are readily distinguishable because they do not address claims involving allegations that tribal officials engaged in intentional misconduct for their own benefit.

These modifications do not change the judgment.

The petition for rehearing filed by defendants and respondents is DENIED. Defendants contend Government Code section 68081 requires us to grant rehearing to address Public Law 280's application to this case. Government Code section 68081, however, only requires rehearing when an appellate court "renders a decision in a proceeding . . . based upon an issue which was not proposed or briefed by any party to the proceeding." "The parties do not 'have a right under section 68081 to submit supplemental briefs or be granted a rehearing each time an appellate court relies upon authority or employs a mode of analysis that was not briefed by the parties.'" (*Mark v.*

6

*Spencer* (2008) 166 Cal.App.4th 219, 228, fn. 4.) Public Law 280's application to this case is not an issue on which we based the opinion. We cited that law merely as preliminary background. The issue we decided was whether sovereign immunity applied to protect Defendants from plaintiffs' claims, and we decided that issue based on *Turner v. Martire* (2000) 82 Cal.App.4th 1042, and the other cited cases addressing sovereign immunity for tribal officials. Defendants were given and full and fair opportunity to brief and argue that issue and those authorities. The remainder of the rehearing petition is an attempt to reargue the merits of the case that likewise does not warrant rehearing.

Defendants' request to depublish the opinion also is DENIED. A depublication request is properly directed to the Supreme Court. (Cal. Rules of Court, rule 8.1125.) A request that we depublish our own opinion is essentially a request that we reconsider our decision to publish the opinion. We decline to do so.

ARONSON, ACTING P. J.

WE CONCUR:

FYBEL, J.

THOMPSON, J.

7

Filed 5/28/15  (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BENEDICT COSENTINO,<br><br>    Plaintiff and Appellant,<br><br>          v.<br><br>STELLA FULLER et al.,<br><br>    Defendants and Respondents. | G050923<br><br>(Super. Ct. No. MCC1300396)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Riverside County, Richard J. Oberholzer, Judge.  (Retired judge of the Kern Superior Court assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed.

Law Office of Andrew W. Twietmeyer and Andrew W. Twietmeyer for Plaintiff and Appellant.

Law Office of Frank Lawrence and Frank Lawrence for Defendants and Respondents.

\*          \*          \*

Plaintiff and appellant Benedict Cosentino appeals from an order dismissing his claims against defendants and respondents Stella Fuller, John R. Magee, Jason P. Maldonado, William R. Ramos, and Robert B. Vargas (collectively, Defendants) based on the sovereign immunity afforded to Indian tribes and their officials. Cosentino was a table games dealer at an Indian tribal casino and Defendants were the five members of the tribe's gaming commission responsible for licensing individuals involved in the tribe's gaming activities and overseeing those activities.

Shortly after he began working at the casino, Cosentino observed ongoing criminal activity on the casino floor. Based on his observations, Cosentino became a confidential informant for the California Department of Justice and the information he provided led to several criminal convictions. Defendants later sought to learn what information Cosentino provided the Department of Justice, but he followed the Department's instructions not to divulge the information. When Cosentino declined to disclose the information, Defendants revoked his gaming license and the casino terminated his employment because he could not work at the casino without a valid license.

Cosentino brought this action against Defendants, claiming they revoked his gaming license without cause and in retaliation for acting as an informant. Defendants specially appeared to make a motion to quash and dismiss, arguing sovereign immunity deprived the court of subject matter jurisdiction because Cosentino based all of his claims on Defendants' official actions as members of the tribe's gaming commission. The trial court agreed and granted the motion.

We reverse. For sovereign immunity to apply, the claims against tribal officials must be based on actions the officials took in their official capacity *and* within the scope of their official authority. An official's actions that exceed the scope of his or her authority are not protected. Although the parties do not dispute that as members of the tribe's gaming commission Defendants had the authority to revoke a gaming license

2

if they received reliable information the licensee no longer satisfied the requirements for obtaining a license or had engaged in conduct that reflected poorly upon the tribe or its gaming activities, the record lacks evidence showing Defendants received any such information about Cosentino or an explanation of why they revoked his gaming license. Cosentino, however, presented evidence supporting his claim Defendants exceeded the scope of their authority by revoking his license without cause and in retaliation against him. Sovereign immunity prevents us from inquiring into the reliability of information Defendants may have relied upon in revoking Cosentino's license or any other errors they may have made, but it does not prevent inquiry into whether Defendants exceeded their authority by using their official position to intentionally harm Cosentino.

I

FACTS AND PROCEDURAL HISTORY

The Pechanga Band of Luiseño Mission Indians (Pechanga Band) is a sovereign Indian tribe recognized by the United States of America. It owns and operates the Pechanga Resort and Casino (Pechanga Casino) as an Indian gaming casino. The Pechanga Gaming Commission (Gaming Commission) is a five-member elected body of the Pechanga Band responsible for overseeing and monitoring all gaming activities on tribal land, including the licensing of certain employees directly involved in gaming activities. Defendants were the five Gaming Commission members during the relevant time period.

In April 2007, the Gaming Commission issued Cosentino a Class A gaming license to work as a table games dealer at the Pechanga Casino. Within his first few months, Cosentino witnessed several instances of criminal misconduct on the casino floor. He reported his observations to his licensing agent, who referred him to McKinney Investigations, LLC, a firm the Pechanga Band had hired to investigate criminal corruption at the Pechanga Casino. The private investigators asked Cosentino if he

3

would work with the California Department of Justice as a confidential informant. Cosentino agreed to do so and the information he shared with the Department of Justice led to several criminal convictions.

In March 2011, the Gaming Commission e-mailed the Pechanga Casino director of table games to request a private meeting with Cosentino at 11:00 a.m. on April 1, 2011. The Gaming Commission did not contact Cosentino directly to request a meeting and the director of table games did not forward the request to Cosentino. His April 1 shift originally was scheduled to start at 12:00 noon, but the day before Cosentino's supervisor switched his start time to 10:00 a.m. without informing Cosentino of his 11:00 a.m. meeting with the Gaming Commission. Cosentino timely reported to work for his April 1 shift. At approximately 11:30 a.m., Cosentino was told to report to the office, where a secretary told Cosentino he missed his scheduled meeting with the Gaming Commission at 11:00 a.m. A shift supervisor then told Cosentino the Pechanga Casino was suspending him pending an investigation and he was escorted from the building.

In mid-April, 2011, the Gaming Commission sent Cosentino a letter stating it had suspended his license with the intent to revoke it, and he had a right to a hearing on the suspension and possible revocation. Cosentino did not receive this letter because the Gaming Commission mailed it to Cosentino's former address, although Cosentino had provided and received mail at his current address from the Pechanga Casino.

In early May, 2011, Cosentino phoned Ramos to ask if he had been fired from his job at the Pechanga Casino. Ramos told Cosentino he had not been fired, and the Gaming Commission merely wanted to meet with him. During this conversation, Ramos did not tell Cosentino he and the other members of the Gaming Commission had suspended Cosentino's license. Ramos put Cosentino in contact with the Gaming Commission secretary to arrange a meeting. The secretary scheduled a meeting and informed Cosentino she had a letter for him from the Gaming Commission. When

4

Cosentino arrived at the Gaming Commission's office to pick up the letter, the secretary gave him a copy of the April letter sent to his old address, and Cosentino learned for the first time that his license had been suspended.

Cosentino met with the five Defendants at the Gaming Commission's offices in mid-May 2011. When he arrived for the meeting, the Gaming Commission's secretary gave him a letter dated May 4, 2011. The letter stated he had requested the meeting as a hearing on his license suspension, although Ramos arranged the meeting and told Cosentino Defendants just wanted to talk to him. Cosentino was anxious about the meeting because Fuller recently joined the Gaming Commission, and the California Department of Justice had informed him members of Fuller's family may have been involved in some on the cases on which Cosentino had provided information.

Cosentino nonetheless met with the five Defendants privately and asked them if he had been fired from his job at the Pechanga Casino. Defendants responded he had not, and that ended their discussion about Cosentino's license and his job. Instead, Defendants proceeded to pressure him for over an hour to disclose the information he gave to McKinney Investigations and the Department of Justice. Fuller appeared agitated throughout the meeting and at one point yelled at Cosentino. As Fuller left the room when the meeting ended, she told Cosentino the Gaming Commission would notify him of its decision. Cosentino asked Fuller which decision she was talking about, and she responded the decision on whether to revoke his gaming license.

A few days later, Ramos phoned to pressure Cosentino to resign his position at the Pechanga Casino, and warned the Gaming Commission would revoke Cosentino's gaming license if he did not resign. Ramos also explained that Cosentino would not be able to get a job at any other casino if his license was revoked. When Cosentino asked why the Gaming Commission was going to suspend his license, Ramos responded the reasons were "'personal'" and he could not share them with Cosentino. Cosentino refused to resign and a few days later he received a notice from the Pechanga

5

Casino explaining his employment had been involuntarily terminated. A week later, Cosentino received a letter from the Gaming Commission revoking his license.

In December 2011, the Pechanga Band Tribal Council arranged a meeting with Cosentino to discuss his experience at the Pechanga Casino and with the Gaming Commission. Cosentino met privately with the council and shared the foregoing events. The council apologized to Cosentino and thanked him for helping the Department of Justice.

In March 2012, the Pechanga Band Tribal Council called a meeting of the tribe's general membership to hear McKinney Investigations discuss its investigation into criminal activity at the Pechanga Casino. Without disclosing Cosentino's identity, McKinney Investigations described his role as a confidential informant in the investigation and his mistreatment by the Gaming Commission. When the presentation was over, Fuller addressed the general membership and identified Cosentino as the confidential informant. A few days later, Fuller resigned from the Gaming Commission under pressure from the Pechanga Band Tribal Council.

After Fuller's resignation, the Pechanga Band's general counsel arranged a meeting with Cosentino. Counsel provided Cosentino with a letter from the Gaming Commission explaining it had reconsidered its decision and Cosentino's "Gaming License status with the Pechanga Gaming Commission is no longer considered to be revoked." Despite this letter, Cosentino has been unable to obtain employment at any Indian casino because he must disclose that his license previously had been revoked.

In March 2013, Cosentino filed this action against Defendants, alleging claims for (1) intentional interference with prospective economic advantage; (2) negligent interference with prospective economic advantage; (3) intentional interference with the right to pursue a lawful occupation; (4) violation of Civil Code section 52.1; (5) intentional infliction of emotional distress; and (6) negligent infliction of emotional distress. Cosentino alleges Defendants unlawfully retaliated against him for serving as a

6

confidential informant by suspending and then revoking his gaming license without explanation or cause. Defendants specially appeared and moved to quash service of summons and dismiss the complaint based on sovereign immunity. In opposition, Cosentino presented evidence supporting the allegations in his complaint. Defendants submitted no evidence rebutting Cosentino's claims. Instead, Defendants argued they were immune from suit and liability because Cosentino sued them based on actions they took in their official capacity as members of the Gaming Commission. The trial court granted the motion, finding Cosentino sued Defendants for improperly revoking his gaming license without identifying any reason. Cosentino timely appealed.[1]

II

DISCUSSION

A.    *Legal Background*

1.     Indian Gaming

"Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." (25 U.S.C. § 2701(5).) Congress enacted the Indian Gaming Regulatory Act (25 U.S.C. § 2701 et seq.; IGRA) "to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of

---

[1]     Cosentino did not name the Gaming Commission or the Pechanga Band as defendants in this action because the Tribal-State Compact requires arbitration of any claims against the Pechanga Band. The Gaming Commission and the Pechanga Band refused to arbitrate Cosentino's claims and he filed a petition in federal court to compel arbitration. The U.S. District Court denied his petition, and Cosentino's appeal from that decision is pending in the Ninth Circuit Court of Appeals.

7

the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." (25 U.S.C. §2702(2).)

The IGRA authorizes three categories or classes of Indian gaming on tribal lands: class I, which includes social, traditional, and ceremonial games; class II, which includes bingo and certain limited types of card games; and class III, which includes all other forms of gaming. (25 U.S.C. § 2703(6)-(8).) A tribe may conduct class III gaming activities if it (1) adopts a gaming ordinance that regulates all gaming activities on tribal lands consistent with the standards established by the IGRA and the Chairman of the National Indian Gaming Commission approves the ordinance; and (2) enters into a tribal-state compact agreeing to conduct all gaming activities according to the terms and conditions negotiated between the tribe and the state where the tribe's lands are located. (25 U.S.C. § 2710(d)(1).) To satisfy these requirements, the Pechanga Band adopted the "Pechanga Gaming Act of 1992" (Pechanga Ordinance) and entered into the "Tribal-State Compact Between the State of California and the Pechanga Band of Luiseño Mission Indians" (Tribal-State Compact).[2] The Pechanga Band also formed the Gaming Commission to carry out its regulatory responsibilities under the IGRA. (See Tribal-State Compact at §§ 2.20, 6.4.1; Pechanga Ordinance at § 4.)

The IGRA requires a tribe's gaming ordinance to establish a licensing system for all "primary management officials and key employees of the gaming enterprise." The system must (1) require a background investigation before any individual may be licensed as a management official or key employee; (2) ensure that all licensed individuals are monitored on an ongoing basis; and (3) establish "a standard whereby any person whose prior activities, criminal record, if any, or reputation, habits and associations pose a threat to the public interest or to the effective regulation of

---

[2] We grant Cosentino's request to judicially notice the Tribal-State Compact and an amendment thereto. (Evid. Code, § 452, subds. (a), (c), (d); see *Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1192.)

gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming shall not be eligible for employment." (25 U.S.C. § 2710(b)(2)(F) & (d)(1)(A)(ii).)  Consistent with these requirements, the Tribal-State Compact and the Pechanga Ordinance require all key employees, including table game dealers like Cosentino, to obtain a gaming license from the Gaming Commission after the employees undergo a background check.  (Tribal-State Compact at §§ 6.4.1, 6.4.4, 6.4.8, 6.5; Pechanga Ordinance at § 10.)

A person is eligible for a gaming license if employing the person does not "pose[] a threat to the public interest or to the effective regulation of gaming, [and does not] create[] or enhance[] dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming."[3]  (Pechanga Gaming Ordinance at § 10(m).)  All persons holding gaming licenses must "conduct themselves with honesty, integrity, and with such decorum and manners as may be necessary to reflect positively on the [Pechanga] Band, its members and the Gaming Activities involved."  (*Id*. at § 10(j).)  A tribal gaming license must be renewed at least every two years.  (Tribal-State Compact at §§ 6.4.4, 6.5.2; Pechanga Ordinance at § 10(f).)

The Gaming Commission must suspend a gaming license if it receives reliable information the licensee no longer satisfies the standards for obtaining a license. The Gaming Commission must provide the licensee with written notice of the suspension

---

[3]     The Tribal-State Compact provides a person is not eligible to receive a gaming license unless the Gaming Commission determines the person is "(a) A person of good character, honesty, and integrity.  [¶]  (b) A person whose prior activities, criminal record (if any), reputation, habits, and associations do not pose a threat to the public interest or to the effective regulation and control of gambling, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of gambling, or in the carrying on of the business and financial arrangements incidental thereto.  [¶]  (c) A person who is in all other respects qualified to be licensed as provided in this Gaming Compact, IGRA, the Tribal Gaming Ordinance, and any other criteria adopted by the Tribal Gaming Agency or the Tribe."  (Tribal-State Compact at § 6.4.3.)

9

and the possible revocation of the license, and the licensee may request a hearing on whether he or she continues to satisfy the standards for obtaining a gaming license. After the hearing, the Gaming Commission must determine whether to revoke or reinstate the license. (Tribal-State Compact at § 6.5.5; Pechanga Ordinance at § 10(p).)

> 2. Sovereign Immunity for Indian Tribes and Their Officials

"The federal government has 'plenary and exclusive power' to deal with Indian tribes." (*Trudgeon v. Fantasy Springs Casino* (1999) 71 Cal.App.4th 632, 635 (*Trudgeon*).) Under Public Law 280 (18 U.S.C. § 1162, 28 U.S.C. § 1360, 25 U.S.C. §§ 1321-1326), Congress has extended to California and five other states "jurisdiction over civil causes of action . . . to which Indians are parties which arise in the areas of Indian country" in those states, and further that the "civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State." (28 U.S.C. § 1360(a).) Sovereign immunity, however, may limit the reach of state law, including state tort law.

"Under federal law, an Indian tribe is a sovereign authority and, as such, has tribal sovereign immunity, not only from liability, but also from suit. [Citations.] Pursuant to tribal sovereign immunity principles, an Indian tribe is subject to suit only where Congress has so authorized or where the Tribe has waived its immunity by consenting to suit. [Citation.] Absent such authorization or consent, the courts do not have subject matter jurisdiction over suits against a tribe. [Citation.]" (*Lawrence v. Barona Valley Ranch Resort & Casino* (2007) 153 Cal.App.4th 1364, 1368 (*Lawrence*); see *Warburton/Buttner v. Superior Court* (2002) 103 Cal.App.4th 1170, 1182 (*Warburton*).) "'[S]overeign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation. [Citation.]' [Citations.] Rather, it presents a pure jurisdictional question." (*Warburton*, at p. 1182.)

10

"Although Indian tribes enjoy broad sovereign immunity from lawsuits, the immunity of Indian tribal officials . . . is more limited." (*Boisclair v. Superior Court* (1990) 51 Cal.3d 1140, 1157 (*Boisclair*).) When tribal officials "act 'in their official capacity and within their scope of authority,'" they are protected by sovereign immunity because their acts are the acts of the sovereign. (*Turner v. Martire* (2000) 82 Cal.App.4th 1042, 1046 (*Turner*); see *Boisclair*, at p. 1157; *Larson v. Domestic & Foreign Commerce Corp.* (1949) 337 U.S. 682, 695 (*Larson*).) On the other hand, when "an officer of a sovereign acts beyond his or her delegated authority, his or her actions 'are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden,'" and therefore sovereign immunity does not apply. (*Turner*, at p. 1055; see *Trudgeon*, *supra*, 71 Cal.App.4th at p. 644; *Larson*, at p. 689.)

An official's commission of a tort is not per se an act in excess of authority, and therefore is not necessarily exempt from immunity. "'[I]f the actions of an officer do not conflict with the terms of his valid statutory authority, then they are actions of the sovereign, whether or not they are tortious under general law . . . .' [Citation.]" (*Boisclair*, *supra*, 51 Cal.3d at p. 1157; see *Turner*, *supra*, 82 Cal.App.4th at p. 1055; *Trudgeon*, *supra*, 71 Cal.App.4th at p. 644; *Larson*, *supra*, 337 U.S. at p. 695.) Accordingly, to determine whether a tribal official is entitled to the protection of sovereign immunity for a tortious act, courts must determine whether the official (1) committed the act in his or her official capacity and (2) within the scope of his or her official authority. (*Boisclair*, at pp. 1157-1158; *Turner*, at p. 1046; *Great Western Casinos, Inc. v. Morongo Band of Mission Indians* (1999) 74 Cal.App.4th 1407, 1421 (*Great Western Casinos*); *Trudgeon*, at pp. 643-644.) "A tribal official also may forfeit immunity where he or she acts out of personal interest rather than for the benefit of the tribe." (*Turner*, at p. 1055.)

11

Because sovereign immunity deprives a court of subject matter jurisdiction, California courts have authorized Indian tribes and their officials to specially appear and invoke their immunity from suit by using a "hybrid motion to quash/dismiss." (*Boisclair*, *supra*, 51 Cal.3d at p. 1144, fn. 1; *Great Western Casinos*, *supra*, 74 Cal.App.4th at p. 1417.) On such a motion, "'the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists.' [Citation.]" (*Lawrence*, *supra*, 153 Cal.App.4th at p. 1369.) "In the absence of conflicting extrinsic evidence relevant to the issue, the question of whether a court has subject matter jurisdiction over an action against an Indian tribe [and its officials] is a question of law subject to our de novo review." (*Ibid.*; *Warburton*, *supra*, 103 Cal.App.4th at p. 1180.)

B.    *The Trial Court Erroneously Concluded Defendants Are Immune From Liability for Cosentino's Claims*

Cosentino contends the trial court erred in applying sovereign immunity to dismiss his claims because he presented unrebutted evidence Defendants exceeded the scope of their authority as members of the Gaming Commission by revoking his gaming license without cause and in retaliation for serving as a confidential Department of Justice informant. We agree.

In *Turner*, the Court of Appeal elaborated on the showing required for dismissing a tort action against tribal officials on sovereign immunity grounds. The plaintiffs were labor union organizers who came to an Indian tribe's gaming casino to speak with employees, and the defendants were tribal law enforcement officers who confronted the plaintiffs and demanded to see their camera. When the plaintiffs refused, the defendants forced the plaintiffs to the ground, seized the camera, struck and kicked the plaintiffs, and used pepper spray on them. The defendants then exposed the camera's film, forced the plaintiffs into a trailer office, arrested the plaintiffs, and called the county sheriff to detain the plaintiffs without probable cause. The plaintiffs sued the defendants individually for assault, battery, false imprisonment, conversion, and civil rights

12

violations, alleging the defendants assaulted and detained the plaintiffs because the defendants opposed the plaintiffs' efforts to inform the casino employees about their collective bargaining rights. The trial court found that tribal sovereign immunity deprived the court of personal and subject matter jurisdiction. The Court of Appeal reversed, concluding the record failed to establish the defendants qualified as tribal officials or acted within the scope of their official authority. (*Turner*, *supra*, 82 Cal.App.4th at pp. 1044-1045.)

The *Turner* court explained that extending sovereign immunity automatically to all individuals associated with an Indian tribe would contravene the purpose for sovereign immunity, and would contravene the basic tenet that individuals should be held accountable for their wrongful conduct. The purpose of extending sovereign immunity to individual officials is to encourage them to exercise their independent judgment for the tribe's benefit without fear of personal liability, and therefore immunity applies only to those officials who perform discretionary or policymaking functions that require the exercise of independent judgment for the tribe's benefit. (*Turner*, *supra*, 82 Cal.App.4th at pp. 1048-1049.) Nothing in the record showed the defendants exercised the sort of discretionary or policymaking authority that would justify applying sovereign immunity. (*Id.* at p. 1054.)

The *Turner* court further explained it could not conclude the defendants acted within the scope of their official authority as tribal law enforcement officers because the record lacked evidence showing the defendants were authorized to use force or detain visitors to the tribe's casino, the circumstances under which the defendants could use force to detain visitors, and that the plaintiffs' conduct justified the defendants in using force to detain them. Without evidence on each of these points, the defendants' bare assertion of sovereign immunity was overcome by the plaintiffs' allegations the defendants exceeded the scope of their authority by engaging in intentional brutality motivated by their personal opposition to the plaintiffs' efforts to inform casino

13

employees about their collective bargaining rights. As the *Turner* court observed, a tribal official who acts out of personal interest rather than for the tribe's benefit forfeits the protections of sovereign immunity. (*Turner*, *supra*, 82 Cal.App.4th at p. 1055 [allegations in plaintiff's complaint "raises a factual issue whether defendants acted for the benefit of the Tribe or merely for personal reasons"].)

In *Boisclair*, the Supreme Court emphasized that sovereign immunity only applies to tribal officials when they act in their official capacity *and* within the scope of their official authority. (*Boisclair*, *supra*, 51 Cal.3d at p. 1157.) There, the plaintiff sued tribal officials for blocking the only road providing access to a granite mine the plaintiff operated on property adjacent to the tribe's reservation. The trial court denied the tribal officials' motion to dismiss the action based on sovereign immunity. (*Id.* at pp. 1145-1146.) The *Boisclair* court denied the officials' petition for writ of mandate because the record lacked evidence showing whether the officials' alleged actions in blocking the road fell within the scope of their authority. The Supreme Court explained any tribal official action to block the plaintiff's access that occurred where the road crossed tribal property would come within the scope of the officials' authority because the tribal officials had the power to control the boundaries to tribal property and to exclude those seeking access. But any tribal official action to block the plaintiff's access to the road outside of tribal property would exceed the officials' authority and therefore sovereign immunity would not protect the tribal officials because they lacked the authority to deny access to nontribal property. (*Id.* at pp. 1157-1158.) The *Boisclair* court remanded the matter for the trial court to determine the precise nature of the officials' actions. (*Id.* at pp. 1158-1159.)

Here, there is no dispute Defendants' positions as Gaming Commission members made them tribal officials for sovereign immunity purposes, and that they had the authority to suspend and revoke Cosentino's gaming license if they received reliable information he no longer satisfied the standards for obtaining a license or had conducted

14

himself in a manner that did not reflect positively on the Pechanga Band or its gaming activities. Nothing in the record, however, shows Cosentino no longer qualified for a gaming license or that he had engaged in any inappropriate conduct warranting suspension or revocation of his license. Moreover, Cosentino alleged and presented evidence showing Defendants exceeded their authority by revoking his license without cause and in retaliation for acting as a Department of Justice informant.

Specifically, Cosentino presented evidence that he served as a confidential informant and provided information that led to several criminal convictions for illegal activities at the Pechanga Casino. Defendants suspended his gaming license without notifying him after he failed to appear for a meeting with Defendants because his supervisor did not inform him of the meeting and did not provide another dealer to cover Cosentino's gaming table until well after the scheduled meeting. When Cosentino later met with Defendants to discuss his activities as an informant, they served him with a letter belatedly informing him the meeting was convened to determine whether they should revoke his license. Defendants nonetheless did not ask Cosentino about his license, but instead questioned him extensively about the information he gave to the Department of Justice. When Cosentino declined to answer some of their questions based on the Department's instructions not to divulge the information, Defendants revoked Cosentino's gaming license without identifying any reason for doing so. The revocation forced the Pechanga Casino to terminate his employment. Cosentino later asked Ramos why Defendants revoked his license and Ramos responded he could not say because the reasons were personal. After the Pechanga Band's Tribal Council forced Fuller to resign as a Gaming Commission member, the Commission informed Cosentino it no longer considered his license revoked, but it failed to restore his job.

In the face of this evidence, Defendants presented no evidence to rebut or deny Cosentino's claim they revoked his license in retaliation and without cause. Similarly, Defendants presented no evidence showing they received any information

15

about Cosentino's qualification to hold a gaming license or why they suspended and revoked his license. Defendants also failed to present any authority showing they had the power to revoke Cosentino's license without cause. Accordingly, as in *Turner*, Cosentino's allegations and evidence that Defendants exceeded their authority by revoking his license without cause defeat Defendants' claim of sovereign immunity. (*Turner*, *supra*, 82 Cal.App.4th at pp. 1054-1055.)

Defendants contend sovereign immunity applied because all of Cosentino's claims are based on the revocation of his license and Defendants indisputably had the authority as Gaming Commission members to revoke Cosentino's license. Defendants misconstrue the scope of sovereign immunity for tribal officials and the scope of their authority as Gaming Commission members.

Sovereign immunity is not absolute and does not apply every time a tribal official acts in his official capacity. For sovereign immunity to apply, the tribal official must not only act in his or her official capacity, the official also must act within the scope of his or her official authority. (*Boisclair*, *supra*, 51 Cal.3d at p. 1157; *Turner*, *supra*, 82 Cal.App.4th at p. 1046.) For example, in *Turner*, the inquiry was not simply whether the tribal law enforcement officers had the authority to use force and detain individuals; rather, the court also had to determine under what circumstances the officers could exercise any use of force or detention authority, and whether those circumstances existed. (*Turner*, at pp. 1054-1055.) Similarly, in *Boisclair*, the inquiry was not simply whether the tribal officials had the authority to deny access to tribal property by blocking an access road, but whether the tribal officials blocked the road on tribal property, where they had authority to do so, or on nontribal property, which would exceed their authority. (*Boisclair*, at pp. 1157-1158.) Accordingly, our inquiry here is not limited to whether Defendants had the authority to revoke Cosentino's gaming license, but also includes the circumstances under which Defendants may exercise their authority and whether those circumstances existed.

16

The IGRA, the Tribal-State Compact, and the Pechanga Ordinance granted Defendants broad authority to suspend and revoke Cosentino's gaming license, but that authority was not unlimited. As explained above, Defendants could suspend or revoke Cosentino's gaming license only if they received reliable information that (1) his licensure posed a threat to the public interest or the effective regulation of gaming; (2) his licensure created or enhanced dangers of unsuitable, unfair, or illegal practices, methods and activities in the conduct of gaming; or (3) he failed conducted himself with honesty, integrity, and with such decorum and manners as necessary to reflect positively on the Pechanga Band, its members, and its gaming activities. (25 U.S.C. § 2710(b)(2)(F) & (d)(1)(A)(ii); Tribal-State Compact at § 6.4.3; Pechanga Gaming Ordinance at § 10(j) & (m).) Nothing in the record shows Defendants had the authority to revoke Cosentino's license without cause or in retaliation for his cooperation with law enforcement. Accordingly, sovereign immunity does not protect Defendants from this action unless they revoked his license on a ground identified in the IGRA, the Tribal-State Compact, or the Pechanga Ordinance.

Defendants also contend the IGRA, the Tribal-State Compact, and the Pechanga Ordinance did not require them either to explain why they revoked Cosentino's license or to produce evidence to support their decision. Defendants miss the point. It is irrelevant whether the IGRA, the Tribal-State Compact, and the Pechanga Ordinance required Defendants to provide an explanation or produce evidence to justify their decision. We are not deciding whether Defendants followed the proper procedure or had sufficient evidence to support their decision to suspend and revoke Cosentino's license. Rather, we must decide whether sovereign immunity applies to bar this action in its entirety. To make that decision, we must determine whether Defendants acted in their official capacity and within the scope of their authority. Cosentino presented evidence to show Defendants exceeded their authority under the IGRA, the Tribal-State Compact, and the Pechanga Ordinance because they revoked his license without cause in retaliation

17

for him cooperating with law enforcement. The burden therefore shifted to Defendants to rebut Cosentino's evidence. Accordingly, to invoke sovereign immunity's protections Defendants were required to produce evidence or law showing they acted within the scope of their authority in revoking Cosentino's license regardless whether IGRA, the Tribal-State Compact, and the Pechanga Ordinance required them to provide an explanation or cite evidence when making their decision.

Defendants next contend they had no obligation to produce evidence or provide an explanation because sovereign immunity not only protects them from liability, but also from the burdens of litigation, such as discovery and the obligation to produce evidence. Again, Defendants miss the point. Sovereign immunity protects tribal officials from both liability and suit. To show sovereign immunity applies, however, tribal officials may be required to participate in limited discovery and present evidence to convince the court sovereign immunity deprives it of jurisdiction to hear the case. (*Warburton*, *supra*, 103 Cal.App.4th at p. 1181 [limited discovery may be required to determine whether sovereign immunity applies]; *Great Western Casinos*, *supra*, 74 Cal.App.4th at p. 1418 ["'Where the motion to dismiss is based on a claim of . . . sovereign immunity, which provides protection from suit and not merely a defense to liability . . . the court must engage in sufficient pretrial factual and legal determinations to "'satisfy itself of its authority to hear the case' before trial"'"].)

We emphasize the appropriate inquiry is not whether Defendants properly exercised their authority, but only whether they acted within the scope of their authority. As explained above, the purpose of extending sovereign immunity to tribal officials is to encourage the officials to exercise their independent judgment for the tribe's benefit without concern they may be held personally liable for how they exercised their judgment or any mistakes they may have made. (*Turner*, *supra*, 82 Cal.App.4th at pp. 1048-1049; see *Larson*, *supra*, 337 U.S. at p. 695.) For example, sovereign immunity would apply to protect Defendants from liability if they revoked Cosentino's license based on

18

information he had helped a player cheat on a game, even if that information later turned out to be false or Defendants failed to conduct an adequate investigation. Similarly, sovereign immunity would apply if Defendants revoked Cosentino's license based on an erroneous interpretation of the IGRA, the Tribal-State Compact, or the Pechanga Gaming Ordinance. Those mistakes are protected by sovereign immunity because they are errors in the judgment with which Defendants were entrusted. If mistakes in how Defendants performed their official duties exposed them to personal liability, then few people would be willing to serve on the Gaming Commission.

Cosentino's claims, however, are not based on Defendants' reliance on questionable information, their failure to perform an adequate investigation, or their erroneous interpretation of a legal standard. Rather, Cosentino alleges Defendants engaged in intentional misconduct and revoked his license without cause to retaliate against him. Defendants presented no authority, and we have found none, that extends tribal sovereign immunity to an intentional abuse of authority. To the contrary, the law withholds sovereign immunity for a tribal official who acts out of personal interest rather than to benefit the tribe. (*Turner*, *supra*, 82 Cal.App.4th at p. 1055.)

Although Defendants cite several cases to support their contention the trial court properly dismissed Cosentino's claims based on sovereign immunity, Defendants fail to discuss or even cite *Turner*, the only analogous factual situation involving a claim of sovereign immunity by tribal officials who allegedly exceeded the scope of their authority by engaging in intentional misconduct designed to harm the plaintiff. The cases Defendants cite are readily distinguishable because they do not address that factual scenario. (See *Trudgeon*, *supra*, 71 Cal.App.4th at pp. 643-644 [sovereign immunity barred negligence claim against tribal officials who allegedly failed to provide adequate security at gaming casino because plaintiff did not allege officials' decision regarding security exceeded scope of their authority]; *Great Western Casinos*, *supra*, 74 Cal.App.4th at pp. 1423, 1424 [outside counsel immune from liability to third party

19

for advice given to Indian tribe because tribe must be able to hire agents to assist in its operations and expect loyalty and candor in advice agents provide]; *Gaming Corp. of America v. Dorsey & Whitney* (8th Cir. 1996) 88 F.3d 536, 550 [same]; *Hardin v. White Mountain Apache Tribe* (9th Cir. 1985) 779 F.2d 476, 479-480 [sovereign immunity applied because tribal officials acted within scope of their authority when removing plaintiff from tribal lands].)

Finally, Defendants contend we should affirm the trial court's dismissal of Cosentino's claims even if we conclude sovereign immunity does not apply because (1) Cosentino assumed all risk and waived all claims relating to his gaming license; (2) Fuller's statements disclosing Cosentino's identity as the confidential informant are absolutely privileged because Fuller made her statements to a legislative body during a Pechanga Band general membership meeting; (3) the Pechanga Band and Gaming Commission are indispensible parties that cannot be joined based on their sovereign immunity; and (4) the IGRA, the Tribal-State Compact, and the Pechanga Gaming Ordinance do not provide Cosentino a private right of action to challenge the propriety of Defendants' decision to revoke his license. We decline to address these arguments for two reasons.

First, Defendants failed to make these arguments in the trial court, and therefore cannot assert them for the first time on appeal. (*In re Marriage of Harris* (2007) 158 Cal.App.4th 430, 440 [new theories of defense may not be raised for first time on appeal].) Second, Defendants have not cited any authority that allows them to specially appear and raise these arguments through their hybrid motion to quash/dismiss the action. As explained above, case authority expressly authorizes Indian tribes and their officials to make a special appearance to assert sovereign immunity through a hybrid motion to quash/dismiss because sovereign immunity deprives the trial court of subject matter jurisdiction. (*Boisclair*, *supra*, 51 Cal.3d at p. 1144, fn. 1; *Great Western Casinos*, *supra*, 74 Cal.App.4th at p. 1417.) These arguments are affirmative defenses

20

that only may be raised through an answer or demurrer after a defendant makes a general appearance.

## III

### DISPOSITION

The order is reversed.  Cosentino shall recover his costs on appeal.


ARONSON, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.

21